SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
FRANK FALZETTA, Cal. Bar No. 125146
  ffalzetta@sheppardmullin.com
DAVID E. DWORSKY, Cal. Bar No. 272167
  ddworsky@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Telephone:  (213) 620-1780
Facsimile:   (213) 620-1398

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
JEFFREY S. CROWE, Cal. Bar No. 216055
  jcrowe@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
Telephone:  714.513.5100
Facsimile:   714.513.5130

Attorneys for Defendant
GOLDEN EAGLE INSURANCE
CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA –WESTERN DIVISION

| | |
|---|---|
| 1700 PCH DEVELOPMENT, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN EAGLE INSURANCE CORPORATION, a New Hampshire Corporation, CLARK SEIF CLARK, a California Corporation,<br><br>Defendants. | Case No. 2:19-cv-10151-TJH-JCx<br><br>**DISCOVERY MOTION DECLARATION OF DAVID DWORSKY IN SUPPORT OF GOLDEN EAGLE INSURANCE CORPORATION'S MOTION TO COMPEL FURTHER INSPECTION AND TESTING OF PROPERTY**<br><br>*[Notice of Motion and Motion, Joint Stipulation and Declaration of Jeffrey Gesell filed concurrently herewith; [Proposed] Order lodged concurrently herewith]*<br><br>Date:     October 20, 2020<br>Time:    9:30 a.m.<br>Crtrm.:   750<br>DCO:     October 30, 2020<br>PTC:      February 8, 2021<br>Trial:      Not Set |

I, David Dworsky, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a special counsel with Sheppard, Mullin, Richter & Hampton LLP, attorneys of record for defendant Golden Eagle Insurance Corporation ("Golden Eagle") in this matter. I have personal knowledge of the following and, if called and sworn as a witness, I could and would competently testify to all facts within my personal knowledge.

2. This Declaration is submitted in support of Golden Eagle's concurrently-filed Motion to Compel Further Inspection and Testing of Property.

3. The Court issued its initial Scheduling Order in this matter on January 27, 2020, a true and correct copy of which is attached hereto as **Exhibit 1**. Pursuant to the Parties' Stipulation (ECF 22) given Covid-19 restrictions related to discovery, the Court amended its Scheduling Order on May 19, 2020. I have attached to this Declaration as **Exhibit 2** a true and correct copy of the Court's Amended Scheduling Order.

4. On March 4, 2020, counsel for Golden Eagle, Jeffrey Crowe, sent an email to Plaintiff's counsel inquiring about a discovery schedule moving forward, which included scheduling a site inspection. I have attached to this Declaration as **Exhibit 3** a true and correct copy of Mr. Crowe's March 4, 2020 email. On March 13, 2020, Plaintiff's counsel responded and inquired about who would attend, each attendee's role and background, the scope and duration of the inspection, and the inspection protocol. I have attached to this Declaration as **Exhibit 4** a true and correct copy of Plaintiff's counsel's March 13, 2020 email.

5. On July 9, 2020, Mr. Crowe sent an email to Plaintiff's counsel to resume discussions about Golden Eagle's site inspection of the hotel. To facilitate the discussion, Golden Eagle's counsel included an anticipated scope of the inspection. I have attached to this Declaration as **Exhibit 5** a true and correct copy of Mr. Crowe's July 9, 2020 email.

6. On July 10, 2020, Plaintiff's counsel sent a response email to Mr. Crowe. I have attached to this Declaration as **Exhibit 6** a true and correct copy of Plaintiff's counsel's July 10, 2020 email.

7. On July 16, 2020, Mr. Crowe responded and asked for dates to conduct the site inspection and explaining that, while Golden Eagle would agree to identify its consultants, it would not waive any attorney work product protections. I have attached to this Declaration as **Exhibit 7** a true and correct copy of Mr. Crowe's July 16, 2020 email.

8. On July 24, 2020, Plaintiff's counsel sent Mr. Crowe an email disclosing, for the first time, that the property had been demolished and that "all that remains is the concrete structure so it's hard for us to understand how the inspection will take two days." Plaintiff's counsel also attempted to limit the inspection to one day, and asked for details about the sampling and testing of smoke, soot and ash that Golden Eagle's consultants intended to conduct. However, Plaintiff's counsel did not state that the elevators would be off-limits, or that Golden Eagle would be prohibited from taking samples of electrical wiring/conduit. I have attached to this Declaration as **Exhibit 8** a true and correct copy of Plaintiff's counsel's July 24, 2020 email.

9. Mr. Crowe responded on July 24, 2020, and informed Plaintiff's counsel that "at no time has your office advised us or notified Golden Eagle that Plaintiff was: (1) demolishing the property leaving only the 'concrete structure'; or (2) conducting any 'abatement' or 'remediation' of the property." Mr. Crowe also reiterated the reasons for Golden Eagle's site inspection. I have attached to this Declaration as **Exhibit 9** a true and correct copy of Mr. Crowe's July 24, 2020 email.

10. Golden Eagle served a Request for Entry upon Land for Inspection on July 24, 2020 (the "Original Notice"), setting the site inspection to take place on August 25 and 26, 2020. The Original Notice included the same protocols that were included in Mr. Crowe's July 9, 2020 email. I have attached to this Declaration as **Exhibit 10** a true and correct copy of the Original Notice.

11. Plaintiff's counsel sent Mr. Crowe an email on July 27, 2020, informing him that demolition at the property had begun "a while ago and is ongoing." I have attached to this Declaration as **Exhibit 11** a true and correct copy of Plaintiff's counsel's July 27, 2020 email.

12. Mr. Crowe responded the same day, requesting a call to discuss the issues and asking additional questions regarding the demolition and remediation. I have attached to this Declaration as **Exhibit 12** a true and correct copy of Mr. Crowe's July 27, 2020 email.

13. On August 3, 2020, a telephone conference took place between Mr. Crowe, Plaintiff's counsel Stephanie Charlin, and me. During that conversation, Ms. Charlin stated her understanding that the only things remaining in the hotel building were the concrete walls. She stated that the electrical wiring and

-3-

1 conduit may still be there, but she did not want to say that definitively without
2 further consulting with her client. At no point did Ms. Charlin ever state that, if the
3 electrical wiring and conduit remained, Golden Eagle would be prohibited from
4 taking samples consistent with its stated inspection protocol. Ms. Charlin also
5 informed us that the originally scheduled dates (August 25 and August 26) no longer
6 worked for Plaintiff, and asked if the parties could reschedule the site inspection to
7 take place on August 26 and August 27.

9       14. On August 4, 2020, Golden Eagle served an Amended Request
10 for Entry upon Land for Inspection (the "Amended Notice"), which contained the
11 exact same protocols as the Original Notice, but changed the inspection dates to
12 August 26 and August 27, 2020 to accommodate Plaintiff's request. I have attached
13 to this Declaration as **Exhibit 13** a true and correct copy of the Amended Notice.

15       15. On August 4, 2020, I sent Ms. Charlin an email summarizing our
16 telephone conference of that same day. I have attached to this Declaration as
17 **Exhibit 14** a true and correct copy of my August 4, 2020 email.

19       16. Ms. Charlin responded on August 7, 2020. I have attached to
20 this Declaration as **Exhibit 15** a true and correct copy of Ms. Charlin's August 7,
21 2020 email.

23       17. After the parties exchanged additional emails concerning
24 logistics, the first day of the site inspection took place on August 26, 2020. I
25 personally attended the site inspection along with additional counsel for both parties,
26 each side's consultants, and a videographer retained by Golden Eagle.

18. During the inspection, I personally noticed that the elevators were not boarded up, but the doors were closed. In addition, I noticed many examples of clearly inoperable electrical conduit and wiring hanging from the ceiling and walls throughout the property. I have attached to this Declaration as **Exhibit 16** a true and correct copy of photographs taken by Golden Eagle's consultants at the property, showing the elevators, electrical conduit and wiring.

19. At the end of the first day of inspection, Mr. Crowe and I informed Plaintiff's counsel that we wanted to have the elevator doors opened for the second day of the inspection, and that Golden Eagle's consultants planned to take small samples of the loose electrical wiring and conduit for testing and analysis. Plaintiff's counsel would not agree to the requests, and expressed hesitation about permitting access to the elevator cars and shaft and allowing Golden Eagle's consultants to take samples of the electrical wiring/conduit. However, Plaintiff's counsel stated that she would respond about the issues that evening.

20. Plaintiff's counsel sent an email that evening, on August 26, 2020, and refused to agree to Golden Eagle's requests regarding the elevator and the electrical conduit/wire sampling. I have attached to this Declaration as **Exhibit 17** a true and correct copy of Plaintiff's counsel's August 26, 2020 email.

21. Mr. Crowe responded to Plaintiff's counsel that night. I have attached to this Declaration as **Exhibit 18** a true and correct copy of Mr. Crowe's August 26, 2020 email.

22. The second day of the site inspection took place on August 27, 2020. I personally attended the second day of the site inspection along with additional counsel for both parties, each side's consultants, and a videographer

-5-

1  retained by Golden Eagle.  The parties met and conferred that morning to discuss
2  Golden Eagle's requests, and Plaintiff's counsel, Christopher Noyes, reiterated that
3  Plaintiff would not allow access to the elevator cars and shaft, and would not allow
4  Golden Eagle's consultants to take any samples of electrical wiring and conduit
5  from the property.

7          23.     On August 29, 2020, Plaintiff's counsel sent Mr. Crowe and me
8  an email discussing both requests by Golden Eagle.  I have attached to this
9  Declaration as **Exhibit 19** a true and correct copy of Plaintiff's counsel's August 29,
10 2020 email.

12         24.     On September 1, 2020, Mr. Crowe sent Plaintiff's counsel a
13 letter that explained in detail why Golden Eagle's proposed inspection, testing and
14 sampling of the elevators and electrical wiring/conduit is relevant and necessary.
15 Specifically, Mr. Crowe made clear that Golden Eagle's consultants asked to take
16 samples of electrical wiring and conduit at locations where the wiring and conduit is
17 easily accessible and does not require destruction of any other portions of the
18 property.  Moreover, Mr. Crowe explained that sampling and testing of the electrical
19 wiring and conduit is relevant and necessary to evaluate Plaintiff's contention and
20 hypothesis that soot from the fire allegedly compromised some or all of the
21 electrical wiring in conduit throughout the building.  Mr. Crowe also made clear that
22 Golden Eagle and its consultants are entitled to inspect, sample and evaluate the
23 condition of the elevator cars and shafts to evaluate and defend against Plaintiff's
24 claim that soot damage to the elevators requires substantial remediation and repairs.
25 I have attached to this Declaration as **Exhibit 20** a true and correct copy of Mr.
26 Crowe's September 1, 2020 letter, with the exhibits thereto.  Plaintiff's counsel did
27 not respond to Mr. Crowe's letter.
28

-6-

25. I have attached to this Declaration as **Exhibit 21** a true and correct copy of a Modernization Proposal prepared by Thyssenkrupp Elevator Company in March of 2020, that Plaintiff produced in this litigation, and which helps form the basis for Plaintiff's damages claims. I have also attached to this Declaration as Exhibit 21 a true and correct copy of an "elevator repairs" estimate sheet describing approximately $644,273.60 in "fire related repairs."

26. Plaintiff's Interrogatory Responses in this matter include a "detailed description" of Plaintiff's alleged approximate repair costs arising from the fire. I have attached to this Declaration as **Exhibit 22** a true and correct copy of Plaintiff's Interrogatory Responses, which were served on our office on March 19, 2020.

27. During this litigation, Plaintiff has produced a report from Forensic Building Science, Inc., which Plaintiff contends supports its claims regarding the costs to replace the electrical wiring. I have attached to this Declaration as **Exhibit 23** a true and correct copy of this report.

28. Plaintiff has also stated that its damages estimates are based on a report prepared by Anderson Group International, which includes an estimate for over $1.2 million to replace the electrical wiring contained in conduit throughout the property. I have attached to this Declaration as **Exhibit 24** a true and correct copy of this report.

29. As explained in Mr. Crowe's September 1, 2020 letter (Exhibit 20), sampling and analysis of exposed electrical wiring and conduit will allow Golden Eagle and its litigation consultants to: (1) assess Plaintiff's claim that fire-related smoke particulates have compromised or damaged electrical wiring, such

-7-

that all electrical wiring needs to be removed and replaced for approximately $1.2 million; and (2) assess Plaintiff's claim that chlorine was detected in electrical conduit, which Plaintiff's consultant, FBS, contends demonstrates that fire-related smoke particulates compromised or damaged electrical wiring somewhere within the conduit.  Additionally, a visual inspection and/or non-destructive surface sampling of the elevator cars, mechanical/electrical equipment and shaft for alleged smoke particulates will allow Golden Eagle and its litigation consultants to:  (1) assess Plaintiff's claim that smoke particulates from the fire must be cleaned from and/or have damage portions of the elevator cars, shaft and mechanical/electrical equipment; and (2) assess Plaintiff's claim that water from fire extinguishing efforts caused corrosion to or have otherwise damaged the elevator cars, shaft and mechanical/electrical equipment.  Thus, Golden Eagle's consultants, which include, without limitation, a Certified Industrial Hygienist with a Masters in Public Health and Bachelors of Science in Environmental Toxicology, a Licensed Professional Mechanical Engineer with a Ph.D. in Mechanical Engineering who is also a Certified Fire & Explosions Investigator, and a Licensed Contractor, propose to do the following as part of an additional inspection of the property:

   (1) Accessing the elevator cars, shafts and related mechanical/electrical rooms to visually inspect, photograph, and sample by way of non-destructive surface and/or micro-vacuum techniques.  Any such samples will be transferred under chain-of-custody for laboratory analysis to examine for the presence and/or concentration of any smoke particulates.  To complete the inspection, power will have to be restored to the elevators, however, Golden Eagle will be responsible for retaining a licensed elevator specialist to open or provide access to the elevator cars and shafts;

   (2) Collecting samples of exposed electrical wiring for laboratory analysis and chemical component analysis for purposes of accessing Plaintiff's

claim that electrical wiring has been damaged or compromised (e.g., corroded) by smoke particulates, from the following locations:

- The left and right wall outlets in Room 211 (the location of the fire), as well as the rooms on either side and immediately across from Room 211;
- The left and right wall outlets in Room 311, as well as the rooms on either side and immediately across from Room 311;
- The left and right wall outlets of Room 411, as well as the rooms on either side and immediately across from Room 411;
- The left and right wall outlets in a room on each end of the hallway on Floors 2-4; and
- Two samples of exposed wiring from conduit in each of the hallways on Floors 2-4.
- The size of the wiring samples shall be no more than 12 inches, and may be shorter depending on the length of available wiring at each location; and

(3)  Collecting no more than 4 samples (with each sample not to exceed 6 inches in length) of exposed or hanging electrical conduit throughout the hotel, which will not damage the building, for laboratory dissection and testing for the presence of any chlorine or chlorine deposits. Golden Eagle will bear the cost associated with the sampling and laboratory analysis and testing.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed September 18, 2020 at Los Angeles, California.

*/s/ David Dworsky*
David Dworsky